1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9   MARY H. DeMAIO,                          CASE NO. 1:09-cv-01840-SMS

10                          Plaintiff,
                                             ORDER AFFIRMING AGENCY'S
11          v.                               DENIAL OF BENEFITS

12   MICHAEL ASTRUE,
     Commissioner of Social Security,
13
                          Defendant.
14   _____/

15
16          Plaintiff Mary H. DeMaio, proceeding *in forma pauperis*, by her attorneys, Binder &

17   Binder, LLC, seeks judicial review of a final decision of the Commissioner of Social Security

18   ("Commissioner") denying her application for disability insurance benefits under Title II of the

19   Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The matter is currently before the

20   Court on the parties' cross-briefs, which were submitted, without oral argument, to the

21   Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following a review of the

22   complete record and applicable law, this Court affirms the Commissioner's decision.

23   I.     **Administrative Record**

            A.      **Procedural History**
24
            On February 7, 2007, Plaintiff filed for Title II disability insurance benefits, alleging
25
     disability beginning October 12, 2006.  AR 25.  Her claim was denied initially, and upon
26
     reconsideration, on August 3, 2007.  AR 25.  On September 26, 2007, Plaintiff filed a timely
27

28   _____
           [1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 8 & 9).

1  request for a hearing.  AR 25.   Plaintiff appeared and testified at a hearing on March 2, 2009.  AR

2  64-92.  On April 22, 2009, Administrative Law Judge Michael D. Radensky ("ALJ") denied

3  Plaintiff's application.  AR 25-33.  The Appeals Council denied review on September 8, 2009.

4  AR 1-3.  On October 21, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

5  **I.    Agency Record**

6        **Disability Report (AR 147-150).**  Following a face-to-face interview on February 21,

7  2007, agency interviewer W. Ross reported that Plaintiff had difficulty sitting, standing, and

8  walking, but no difficulty hearing, reading, breathing, understanding, being coherent,

9  concentrating, talking, answering, seeing, using hands, or writing.  Ross noted, "She walked

10 slowly.  She was in pain and took two Advils during the interview."  AR 149.

11       **Adult Disability Reports (AR 151-158; AR 162-167; AR 171-176).**  In her initial

12 disability report (February 21, 2007?[2]), Plaintiff reported that because of degenerative disc

13 disease, she experienced constant extreme pain.  She could not sit or stand for any length of time,

14 could not lift or bend, and could not perform daily tasks.  She was discharged from her last job,

15 for which she had been conditionally hired, when she was unable to perform the job's duties.

16       In an undated report prepared for her appeal (June 11, 2007?), Plaintiff reported that her

17 pain had increased, causing difficulty walking and standing and an inability to sit for more than 15

18 minutes.  She was unable to lift more than ten pounds.  She had developed carpal tunnel syndrome

19 and pain in her left shoulder joint.   She reported that the effect of her condition on her ability to

20 care for her personal needs was unknown.

21       In a third report, Plaintiff reported no change in her condition.

22       **Kern Medical Center (AR 189-202; 359-440).[3]**  KMC treated Plaintiff for moderate low

23 back and leg pain on March 2, 2007.  The treating physician diagnosed back strain.  After

24 treatment with Valium, morphine, and toradol, Plaintiff reported a decrease in pain intensity.

25 ///

26

27       [2] Although the disability reports are undated, each later report refers to a prior report by date.

28       [3] KMC records are neither organized by date nor keep together all records of a certain treatment date.

On March 14, 2008, Plaintiff went to the emergency room with severe lower back pain. She had been referred by Clinic of Frazier Park to rule out a pinched nerve. Radiologist Jamshid Jamshidian, M.D., reported on lumbar spine x-rays taken to rule out fracture.  His impression was "Mild to moderate narrowing of L5-S1 intravertebral disc space without evidence of significant osteophyte formation which may be secondary to disc pathology or disc herniation."  AR 380.

On June 23, 2008, James Y. Ching, M.D., reported on an MRI of Plaintiff's lumbar spine. He noted diminished disc height, indicative of degenerative disc dessication at L5-S1.  He also noted mild disc protrusions at L2-L3, L3-L4, L4-L5, and L5-S1.  His impression was degenerative disc disease of the lumbar spine and mild disc protrusions from L2 to S1 with mild neural foraminal stenosis.

On July 3, 2008, Plaintiff went to the emergency room, complaining of left shoulder pain radiating to her hand.  Plaintiff returned to the emergency room on July 11, 2008, complaining of low back pain that had worsened in the past two days.  Janice Nichols, NP-C, noted clinical impressions of chronic low back pain and sciatica.  Plaintiff was given aftercare instructions for low back strain.

On July 16, 2008, Plaintiff went to the KMC clinic for treatment of nausea and vomiting. Patricia Alvarado, P.A., noted chronic lower back pain with recent emergency room treatment.

On July 20, 2008, Plaintiff went to the emergency room, complaining of low back pain, chills, and diarrhea.  Her pain had increased since she ran out of Norco[4] three days earlier.

On July 28, 2008, a physician in the clinic diagnosed Plaintiff as having degenerative joint disease, among other things.  He or she prescribed Vicodin,[5] Elavil,[6] and Nexium.[7]

---

[4] Norco (acetaminophen and hydrocodone) is a narcotic pain reliever.  www.drugs.com/norco.html (February 22, 2011).

[5] Vicodin (acetaminophen and hydrocodone) is a narcotic pain reliever prescribed for moderate to severe pain.  www.drugs.com/vicodin.htmal (February 22, 2011).

[6] Elavil (amitriptyline) is a tricyclic antidepressant.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666 (February 22, 2011).

[7] Nexium (esmomeprazole) is used to treat gastroesophageal reflux disease, in which a backward flow of stomach acid from the stomach causes heartburn and possible injury of the esophagus. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001062 (February 22, 2011).

Dr. K. Sabetian performed nerve conduction tests and electromyography (EMG) on August 15, 2008.  The EMG was normal, with no denervation or myopathy.  The nerve conduction studies revealed normal bilateral post tibial motor and neural sensory potentials but moderate to severe bilateral peroneal motor axonal neuropathy with L5 radiculopathy.

On September 15, 2008, Plaintiff went to the emergency room complaining of middle and lower back pain, numbness in her back and legs, and diarrhea.  She was referred to the neurology clinic.

**Frazier Mountain Community Health Center (AR 47-63; AR 211-324).**  Plaintiff's medical records summarized her major problems as depression; carpal tunnel syndrome; shoulder pain; chronic pain, mostly lower back; and anxiety attacks.  Acute and recurrent problems were low back muscle spasm, lumbar radiculopathy, irregular menses, diarrhea, lumbar spasm, and lower back pain.  Medications included Vicodin, Cymbalta,[8] Neurontin,[9] Valium,[10] Soma,[11] ibuprofen,[12] and Tramadol.[13]

Plaintiff had a new patient consultation on March 20, 2006.  Plaintiff, who reported breaking her tail bone ten years earlier, complained, among other things, of low back pain for the ///

---

[8]  Cymbalta (duloxetine) is used to treat depression and generalized anxiety disorder. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000274 (February 22, 2011).

[9]  Neurontin (gabapentin) is used to treat certain types of epileptic seizures and to relieve the pain resulting from shingles.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940 (February 22, 2011).

[10]  Valium (diazepam) is used to relieve anxiety, muscle spasms and seizures, and to control agitation caused by alcohol withdrawal.  It is also prescribed for irritable bowel syndrome and panic attacks. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000556 (February 22, 2011).

[11]  Soma (carisprodol), a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort from sprains, strains, and other muscle injuries. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000717 (February 22, 2011).

[12]  Ibuprofen is a nonsteroidal anti-inflammatory drug used to treat pain, tenderness, swelling, and stiffness cause by arthritis, as well as to treat other types of pain.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000598 (February 22, 2011).  Common brands include Motrin and Advil.

[13]  Tramadol is an opiate antagonist used to relieve moderate to moderately severe pain in patients requiring round-the-clock pain relief for an extended period.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960 (February 22, 2011).  Plaintiff requested a prescription for tramadol at a June 22, 2009 appointment.  AR 49.

past six weeks.  She had aggravated the pain when lifting a large log with her sons four weeks earlier.  Her prior physician prescribed Lortab[14] and Soma.

On April 4, 2006, Radiologist Martha Weidman reported of Plaintiff's lumbar spine: "There is minimal anterior spondylosis from L2 to L5.  Disc spaces are preserved.  No fracture of dislocation is seen.  Normal alignment is present."  AR 254.  Plaintiff also saw the doctor for lower back pain on April 28, and May 31, 2006.  On May 31, 2006, Plaintiff saw her physician, complaining of menstrual problems, back pain, and shortness of breath.

On October 3, 2006, Plaintiff complained of severe pain in her lower back, legs, and hand. Her physician noted muscle spasms and pain radiating down her right leg.  The physician prescribed Soma and Motrin, and referred Plaintiff to a chiropractor.

On November 7, 2006, Plaintiff complained of severe lower back pain, including pain when she walked and "pins and needles pain," for which she had been taking Advil.  Her physician noted low back pain and lumbar/sacral radiculopathy, prescribing Vicodin and an illegible medication.  On November 21, 2006, Plaintiff stated that Vicodin did not relieve her pain and that she wasn't sleeping.  The physician's name and a large portion of his notes are illegible.

On December 21, 2006, Plaintiff saw Michael V. Lee, M.D., for a follow-up appointment for her back pain and renewal of her prescriptions.  Lee noted pain without spondylosis.  Although he renewed Plaintiff's Norco prescription, Lee directed her to use heat, exercise and stretching, warning her of the potential of Norco addiction.

On January 19, 2007, Lee wrote a brief note indicating that Plaintiff was under treatment and unable to work.  On January 31, 2007, Plaintiff made an appointment for depression but did not show.  On March 6, 2007, x-rays indicated mild levoscoliosis convex at L3-4[15] and moderate disc narrowing at L5-S12.

///

[14]  Lortab (acetaminophen and hydrocodone) is a narcotic pain reliever used to relieve moderate to severe pain. www.drugs.com/lortab.html (February 23, 2011).

[15]  Scoliosis is "an appreciable lateral deviation in the normally straight vertical line of the spine." *Dorland's Illustrated Medical Dictionary* at 1497 (28th ed., 1994).  Levo- indicates curvature toward the left. *Id.* at 923.

On March 23, 2007, Plaintiff complained to Lee, of spasms and pain in her hands, arms, and shoulders. Diagnosing carpal tunnel syndrome and shoulder impingement syndrome,  Lee gave Plaintiff a steroid injection in her left shoulder to decrease pain and improve her range of motion.

On April 21, 2007, Plaintiff was seen for lower back pain and chronic diarrhea. On April 30, 2007, Plaintiff complained to Lee of continued significant back pain and sciatica.  Lee directed her to avoid heavy lifting and  prolonged standing and sitting.

On May 10, 2007, Frazier Park Pharmacy faxed a note to  Lee regarding Plaintiff's request to fill her Neurontin prescription early, noting that this was Plaintiff's third consecutive request for an early refill.

In a letter addressed "to whom it may concern," dated May 11, 2007, Lee described Plaintiff as having "a long history of chronic low back pain with associated radicular symptoms" that was exacerbated by prolonged sitting or standing.  Lee indicated that Plaintiff needed to see a spine specialist.

On July 6, 2007, Plaintiff saw Lee to refill her Soma and Neurontin, complaining of worsened neuropathic pain in her lower back that radiated into her right leg. She demonstrated no loss of sensory motor function and no incontinence.  She complained that taking Neurontin did not always provide pain relief.  Observing that Plaintiff was in discomfort, Lee modified Plaintiff's medications, again adding Norco.

On August 7, 2007, Plaintiff, who had come in to have forms completed for her application for disability benefits, was in moderate distress with back pain radiating into her right leg.  If she sat more than fifteen minutes, both legs became numb and tingly.[16]

On February 29, 2008, Plaintiff saw a medical practitioner for severe sciatica.  She was referred to an orthopedist.  On April 12, 2008, when Plaintiff was seen by a health center physician at Kern Medical Center for urinary incontinence, she expressed concern that she had an enlarged uterus pressing on her bladder.  She was referred to a gynecologist.  On June 16, 2008,

---

[16] Whether Lee observed these symptoms or relied on Plaintiff's representations is not clear.

1    Plaintiff saw an unidentifiable (signature illegible) practitioner, complaining of urinary

2    incontinence and claiming she was allergic to Vicodin.  Plaintiff had not yet seen a gynecologist.

3         On September 9, 2008, Plaintiff was treated at the KMC emergency room for menstrual

4    difficulties.  Plaintiff again went to the KMC emergency room on September 22, 2009,

5    complaining of lower back pain and chronic obstructive pulmonary disease (COPD). Plaintiff

6    requested prescriptions for Soma and Fentanyl patches.[17]  Chest x-rays revealed pulmonary

7    nodules.  A lumbar spine series revealed no significant osteophytes, moderate narrowing of L5-8,

8    and possible disc pathology.

9         Plaintiff saw Anne Chantaphkul, O.D., on April 23, 2009, complaining of chronic back

10   pain and depression as well as insomnia and anxiety.  Although Plaintiff had a primary care

11   physician in Bakersfield, she told Chantaphkul that she had not seen her in eight months because

12   she lacked gas money to drive there.  Chantaphkul noted that Plaintiff was securing Vicodin

13   prescriptions from "various doctors."[18]  On April 29, 2009, Plaintiff complained of anxiety

14   attacks, telling her physician she felt like driving her car off a cliff.  On May 21, 2009, Dr.

15   Chantaphakul diagnosed acute lumbar strain resulting from heavy lifting associated with moving.

16   Plaintiff's back sprain had not responded to ibuprofen on May 27, 2009.

17        **Multiple Impairment Questionnaire (AR 325-331).**  On August 7, 2007, Family

18   Practitioner Rayman Zamirpour, M.D., and Nurse Practitioner Sharon Powell, FNP-C,[19]

19   completed a multiple impairment questionnaire apparently supplied by Plaintiff's attorneys.  They

20   reported that they saw Plaintiff twice monthly for lumbar radiculopathy, which had been

21   ///

22

23        [17]  Fentanyl is a "powerful synthetic opiate analgesic similar to but more potent than morphine."  A schedule
24   II prescription drug, it is typically used to treat patients with severe pain or to manage pain after surgery.  The
     National Institute on Drug Abuse identifies it as a "drug of abuse."  www. ncbi.nlm.nih.gov/drugpages/fentanyl.html
25   (February 22, 2011).

26        [18]  Although Plaintiff's April 23, 2009, prescription of Vicodin noted, "[no] further refills," Chantaphkul
     again prescribed Vicodin on May 27, 2009.  AR 48.

27        [19]  None of Plaintiff's medical records identify Dr. Zamirpour as ever having treated Plaintiff.  Sharon
28   Powell's name appears frequently in the record as a nurse practitioner associated with Dr. Lee.  As signed on AR
     331, it appears that Nurse Powell completed the questionnaire on behalf of Zamirpour.

diagnosed by x-rays taken March 6, 2007, which revealed lumbar spine levoscoliosis L3-L4 and degenerative disc disease L5-S1.

Plaintiff's primary symptoms were sciatic nerve pain radiating down the right leg to foot and tingling and numbness in both legs from thighs to feet. She experienced pain 24 hours per day, precipitated by increased activity or lifting more than ten pounds. Stress and excessive activity also increased Plaintiff's pain. At best, Plaintiff's pain was 6-7 (moderate to moderately severe) on a scale of ten; at worst, 8-9 (moderately severe to severe). Her pain was frequently so severe as to interfere with her attention and concentration. Medication did not completely relieve Plaintiff's pain without unacceptable side effects. Plaintiff's emotions increased her stress and worsened her back pain. Her symptoms would worsen in a competitive work environment. Nonetheless, Plaintiff could tolerate moderate stress.

Zamirpour and Powell estimated that Plaintiff could sit up to one hour in an ordinary work day, and could stand or walk up to one hour in an ordinary work day. She should not sit continuously, but should get up and move around for fifteen minutes every fifteen minutes. Plaintiff should not walk continuously.

Plaintiff could occasionally lift five to twenty pounds and frequently lift five pounds or less. She could occasionally carry ten to twenty pounds and frequently carry ten pounds or less. In an eight-hour workday, Plaintiff would have moderate limitations in reaching, grasping, turning, and twisting objects, but no limitations in fine manipulations. Her condition did not limit her ability to keep her neck in a constant position, as in looking a desk surface or a computer monitor.

Plaintiff's medications were Neurontin, Norco, naproxen,[20] and Soma. Other treatments Plaintiff received were chiropractor, acupuncture, massage, and physical therapy.[21]

---

[20] Naproxen is a nonsteroidal anti-inflammatory drug used to relieve pain, tenderness, swelling, and stiffness caused by certain forms of arthritis and ankylosing spondylitis. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526 (February 22, 2011). Common brands include Naprosyn and Anaprox.

[21] The agency record includes no records of chiropractic treatment, acupuncture, massage, or physical therapy.

1    **Multiple Impairment Questionnaire (AR 346-353).**  On February 3, 2009, Ibrahim

2   Sumari, M.D., a family practitioner, examined Plaintiff and responded to a similar multiple

3   impairment questionnaire apparently supplied by Plaintiff's attorneys.[22]  Because of Plaintiff's

4   sciatica on her right side, Sumari diagnosed chronic lumbrosacral discogenic back pain.  Results

5   of an MRI and nerve conduction study also supported his diagnosis.  Accordingly to Sumari, the

6   MRI revealed degenerative joint disease and disc protrusion at L2, S1.  The nerve conduction

7   study revealed moderate to severe bilateral peroneal neuropathy.

8         Plaintiff experienced tingling and numbness that was greater on the right side than the left

9   side.  The nature of her pain was radiculopathy from the right side of her back down to her right

10  heel.  She experienced pain frequently as a result of bending, lifting, and prolonged sitting or

11  standing.  Her pain was eight to nine on a ten point scale (moderately severe to severe).  Sumari

12  was unable to relieve the pain with medication without unacceptable side effects.

13        Sumari opined that Plaintiff could sit six hours in an eight-hour workday and stand or walk

14  two hours in an eight-hour workday.  She should neither sit nor stand/walk continuously.  Plaintiff

15  could lift and carry up to ten pounds frequently; and up to twenty pounds occasionally.  Because

16  of frequent pain and spasm, Plaintiff had significant limitations in repetitive reaching, handling,

17  fingering, and lifting.  She had no limitations on either side for grasping, turning, or twisting

18  objects; using fingers/hands for fine manipulations; or using arms for reaching.  Her condition

19  interfered with Plaintiff's ability to keep her neck in a constant position, as in looking a desk

20  surface or a computer monitor.   Plaintiff's symptoms would increase in a competitive work

21  environment.  Plaintiff would need to take fifteen minute breaks every ninety minutes.  She was

22  likely to have good days and bad days, and to miss work more than three days per month.  She

23  needed ready access to a restroom.  She needed to avoid noise, fumes, gases, temperature

24  extremes, heights, pushing, pulling, kneeling, bending and stooping.

25  ///

26  ///

27

28

---

[22]  No medical records or notes identify Sumari as a physician who treated Plaintiff.

Plaintiff's medications were Norco, Neurontin, and Soma, all of which caused sedation. Sumari had not attempted to substitute medications to relieve side effects, noting that Plaintiff was "referred to see pain specialist."

Plaintiff could not perform a full-time competitive job on a sustained basis. Her pain, fatigue, and other symptoms frequently interfered with attention and concentration. Anxiety contributed to Plaintiff's symptoms and limitations. She was capable of tolerating low stress.

**Orthopedic Consultation (AR 337-344).** When Zaven Bilezikjian, M.D., examined Plaintiff on January 16, 2009, she had run out of her medications and was not taking any. Plaintiff first injured her back in a fall from a ladder in 1993. She has a history of nine surgeries to her left heel resulting from childhood osteomyelitis. She has experienced more severe pain in the past five years. Her pain increased with standing, sitting, bending, and lifting. Bilezikjian noted:

> The claimant appears as a middle aged woman who appears to be cooperative, alert, and oriented. The claimant does not appear to be in acute or chronic distress. The claimant is able to move about the office with a fair amount of ease, without any assistance, and is able to get on and off the examination table and assume a supine position without any assistance or difficulty.
>
> . . . . . The claimant has a normal posture in static stance. She limps slightly on the left side when she walks and she is able to walk without a cane quite easily. She was able to walk on tiptoes bilaterally, but on the left side she could not walk on her heel.

AR 339.

Plaintiff's lower back was not tender to touch. Bilezikjian saw no evidence of increased muscle tone and spasm. Plaintiff's range of motion was 50 degrees forward; 20 degrees extension, and 30/30 degrees laterally. Straight-leg raising[23] was negative in the sitting position. In the supine position on the right, Plaintiff felt discomfort in her back and right buttock at 80 degrees. Plaintiff had mild lower back pain on the left side at 90 degrees.

///

---

[23]   The straight leg raising test is administered during a physical examination to determine whether a patient with low back pain has an underlying herniated disc. The test is positive if the patient experiences pain down the back of the leg when the leg is raised. *Miller v. Astrue*, 2010 WL 4942814 (E.D. Cal. November 30, 2010) (No. 1:09-cv-1257-SKO).

1    Bilezikjjian diagnosed chronic lumbar strain or sprain; possible mild right-sided

2  radiculitis, but no evidence of radiculopathy; and pain in the left heel resulting from osteomyelitis

3  and related surgeries.  He opined that Plaintiff could continuously lift up to ten pounds; frequently

4  lift from eleven to twenty pounds; and occasionally lift up to fifty pounds.  She could

5  continuously carry up to ten pounds and frequently carry eleven to twenty pounds.  Bilezikjian

6  indicated that Plaintiff could sit two hours at one time, stand one hour at one time, and walk one

7  hour at one time.  She needed a cane but could walk a block without it.  In an eight hour workday,

8  Plaintiff could sit weight hours, stand three hours, and walk three hours.  Plaintiff was able to

9  continuously reach, handle, finger, feel, and push or pull with either hand.  She could frequently

10 operate a foot pedal with her right foot and occasionally operate a foot pedal with her left foot.

11 Plaintiff could frequently kneel, crouch, or crawl; occasionally climb stairs or ramps, balance, or

12 stoop; and should never climb ladders or scaffolds. She had no visual or hearing impairments.

13     **Plaintiff's testimony.**  Plaintiff, a florist,[24] last worked in October 2006, when severe low-

14 back and leg pain (sciatica) made her stop working.  Before she quit her job, she sometimes stood

15 on the job for up to fourteen hours a day during holiday periods.  She had completed twelfth

16 grade.  Her husband had supported her until she filed for divorce.  At the time of the hearing, she

17 had no income from any source, although she received assistance from fellow church members.

18     Despite the pending divorce, Plaintiff had moved back in with her husband, who provided

19 her with funds from time to time, and their two sons.  Plaintiff anticipated that she would be able

20 to move out and get on her feet once she learned the outcome of her disability application.  She

21 saw no possibility for reconciliation, explaining that, if her husband made her leave, she "could

22 actually get him for spousal abuse because of her current condition."  Since her name was still on

23 the lease for their mobile home, Plaintiff thought that her husband should move in with his

24 girlfriend and let her remain in the home.

25 ///

26

27     [24]  Plaintiff characterized herself as a florist, testifying that the bulk of her employment had been in that
field.  A review of Plaintiff's FICA record also reveals extensive experience in a variety of retail businesses as well
28 as in restaurants and casinos. *See* AR 139-146.

A son did the majority of housework.  Plaintiff had begun vacuuming a few days previously, but stopped halfway through asking her son to finish.  She emphasized that her difficulty vacuuming was not due to back pain but due to five broken ribs she had sustain in a recent fall, when the pain in her leg caused her to lose her balance.

Plaintiff continued to create silk and dried flower arrangements and to sew as hobbies, but was unable to work more than 15 to 20 minutes at a time.  Recently, her condition had worsened, requiring her to take a fifteen to twenty minute break after each 15-20 minutes of working.

Plaintiff attended church twice weekly as well as a one-hour weekly Bible study.

She enjoyed cooking, sometimes making something elaborate, like beef bourguignon or eggplant parmesan.  Lately, however, she has lacked funds and depended on gifts from her son and husband to eat.  Recently, her husband had given her $20.00 which enabled her to buy cottage cheese and pineapple.

Plaintiff lies in bed for four to six hours nightly, but wakes frequently due to pain.[25]  Plaintiff's medications included Neurontin, Baclofen,[26] Norco, and Tramadol.  She had stopped taking amitriptyline because it made her too tired.

Plaintiff testified that, depending on the day's pain level, she could stand from fifteen minutes to an hour at a time.  Generally, she could walk twenty minutes at a time, using a cane for balance, for a total of four hours in an eight-hour day.  But on her bad days, when she could only stand for fifteen minutes at a time, she would only be able to stand a total of two hours in an eight-hour day, assuming that she had taken sufficient pain medication.  After every two hours of standing, Plaintiff needed a fifteen to twenty minute break to recline with her feet up or lie on a sofa.

Plaintiff was able to sit for only fifteen to thirty minutes at a time in an office chair, stating, "I wouldn't last 30 minutes in that kind of chair."  She could sit with her feet up four to five hours a day.

---

[25]  Following questions regarding the length of time she could sit, Plaintiff asked for permission to stand up. AR 75.

[26]  Baclofen is a muscle relaxer and antispastic agent.  www.drugs.com/baclofen.html (February 22, 2011).

1  Plaintiff did not think she could perform a job that involved alternate time periods of

2  sitting and standing.  Her medications made her too tired and "loopy" to work.  She lacked

3  education for other work, and she was in too much pain.

4  **Residual Functional Capacity Assessment (AR 203-209).**  Based on all evidence

5  included with Plaintiff's file, Dr. de la Rosa determined that Plaintiff could occasionally lift and

6  carry twenty pounds, and frequently lift and carry ten pounds; stand and walk six hours in an

7  eight-hour workday; and sit for six hours in an eight-hour workday.  She had unlimited ability to

8  push and pull.  Plaintiff should never climb ladders, ropes, or scaffolds, but could occasionally

9  climb ramps and stairs, and stoop.  She could frequently climb ramps and stairs,[27] balance, kneel,

10 crouch, and crawl.

11 **Vocational Expert.**  Vocational expert Luis Mas[28] testified that Plaintiff's prior work as a

12 florist (# 275.357-054) was SVP 4, semiskilled, light level work.  In the first hypothetical

13 question, the ALJ asked whether a younger individual with a high school education and

14 experience as a florist could perform Plaintiff's prior work if the individual was able to lift and

15 carry twenty pounds occasionally and ten pounds frequently; could sit for up to six hours in an

16 eight-hour day with appropriate breaks; stand and walk up to two hours in an eight-hour day with

17 appropriate breaks; occasionally perform postural activities, but could not use ladders, ropes or

18 scaffolds, or work at unprotected heights.

19 Mas opined that such an individual could not perform Plaintiff's prior work as florist.

20 Such an individual could perform light unskilled work such as counter clerk (#249.366-010, SVP

21 2, light-level work), which had 9700 jobs in the region and 347,000 jobs in the country; swatch

22 clerk (# 222.587-050, SVP 2, light level work), which had 6200 jobs in the region and 270,000

23 nationwide; or school bus monitor (# 372.667-042, SVP 2, light level work, which had 3370 jobs

24 in the region and 290,000 jobs in the country.

25 ///

26

27  [27] Rosa checked both frequently and occasionally for climbing ramps and stairs.

28  [28] The transcript refers to Mas as "Moss."

For the second hypothetical question, the ALJ directed Mas to assume that the individual needed to be able to change positions in the work station at will, such as a job with a stool or other position in which the individual could either sit or stand at will.  Mas responded that the first two positions, counter clerk and swatch clerk, would still be available, but that school bus monitors could not stand when the bus was in motion.  The hypothetical individual could perform the jobs of a route aid or route assistant (# 239.687-010, SVP 2, light level), which had 7000 jobs in the region and 570,000 jobs in the country.

For the third hypothetical question, the ALJ added the requirement that the individual be able to rest ten to fifteen minutes per hour.  Mas responded that no such jobs were available.

Plaintiff's attorney then asked Mas to assume an individual who needed to recline for four to five hours in a workday, "recline" being defined as sitting with his or her feet higher than a ninety degree angle.  Mas replied that no such jobs are available.

Noting that the DOT did not have a section identifying positions at which one could sit or stand at will, Plaintiff's attorney then asked Mas for his authority for the positions that he identified.  Mas replied that he identified the positions based on his twenty-two years of experience as a vocational counselor performing on-site job analyses in various locations.

**II.**     **Discussion**

   **A.**     **Legal Standards**

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20
///

14

C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

Step one:    Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:    Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:   Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:   Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:   Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity from October 12, 2006, through March 31, 2008, the last day on which she was insured under the Act.  AR 27. Plaintiff 's severe impairment was degenerative disc disease of the lumbar and lumbrosacral spine.  AR 27.  Her impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P. Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).  AR 27-28.  Plaintiff had past relevant work as a florist.  AR 32.  Plaintiff had the residual functional capacity to perform light work, as defined in 20 C.F.R. §404.1567 (b), except that she could sit six hours in an eight-hour day, and stand or walk two hours in an eight-hour day, with appropriate breaks.  AR 28.  Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds, or work at unprotected heights.  AR 28.  After considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that jobs that Plaintiff could perform existed in the national economy in significant numbers.  AR 32.

**B.    Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  The scope of review requires this Court to consider the record as a whole, examining both the evidence supporting the ALJ's decision and the evidence that does not.

### C.   Did the ALJ Err in Concluding That Plaintiff's Subjective Complaints Were Not Credible?

Plaintiff contends that the ALJ's four rationales for concluding that Plaintiff's testimony was not credible were insufficient to reach that conclusion.  The Commissioner counters that the ALJ's determination that Plaintiff's testimony lacked credibility was supported by substantial evidence.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991).  "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He

1  or she must set forth specific reasons for rejecting the claim, explaining why the testimony is

2  unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466

3  F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the

4  court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.*

5  *Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

6          When weighing a claimant's credibility, the ALJ may consider the claimant's reputation

7  for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct,

8  claimant's daily activities, claimant's work record, and testimony from physicians and third

9  parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social*

10 *Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary

11 techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent

12 statements concerning the symptoms, and other testimony by the claimant that appears less than

13 candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a

14 prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533

15 F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the

16 ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her

17 decision. *Thomas*, 278 F.3d at 959.

18          The Ninth Circuit has summarized the applicable standard:

19          [T]o discredit a claimant's testimony when a medical impairment has been
            established, the ALJ must provide "'specific cogent reasons for the disbelief.'"
20          *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The
            ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.*
21          Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a
            malingerer, those "reasons for rejecting the claimant's testimony must be clear and
22          convincing." *Id.* Social Security Administration rulings specify the proper bases
            for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's
23          testimony cannot be supported by reasons that do not comport with the agency's
            rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have
24          the same force and effect as the statute or regulations, they are binding on all
            components of the Social Security Administration, . . . and are to be relied upon as
25          precedent in adjudicating cases."); *see also Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th
            Cir. 1998) (concluding the ALJ's decision at step three of the disability
26          determination was contrary to agency rulings and therefore warranted remand).
            Factors that an ALJ may consider in weighing a claimant's credibility include
27          reputation for truthfulness, inconsistencies in testimony or between testimony and
            conduct, daily activities, and "unexplained, or inadequately explained, failure to

28

seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

In this case, the ALJ rejected Plaintiff's pain complaints as inconsistent with medical evidence in a thoughtful discussion of approximately four pages in which he carefully considered Plaintiff's testimony in light of the extensive medical records included in the agency record.  First the ALJ contrasted Plaintiff's testimony of continuous extreme pain; inability to sit, stand, lift, or bend; and inability to perform daily tasks, with various facts in the record.   For example, Plaintiff testified that she used a cane at home for balance, but the cane was not medically prescribed and medical records demonstrated no consistent gait abnormalities or neurological deficits.  She walked easily without a cane at the consultative examination.  She claimed a need to elevate her feet and legs although the record reflected only slight swelling of her left heel and foot on a single occasion.  She demonstrated a normal range of motion.  Emergency room doctors noted the contrast between subjective complaints and objective measures.  Plaintiff testified she could sit for no more than thirty minutes but attended church services and Bible study for an hour three times each week.  She drove two hours to the hearing.

The ALJ did not exhaust the many contradictions both between Plaintiff's testimony and other evidence within the record, and within the Plaintiff's testimony itself.  She continued her hobbies of sewing and flower arranging, claiming to stop and rest after short periods of activity.

Plaintiff testified that she had recently had to stop vacuuming her home before she had completed the task but added that she stopped not because of back pain but because of five broken ribs.  She then hastened to testify that the broken ribs resulted from a fall following a loss of balance caused by her back.  Nothing in her medical records referred any loss of balance.

Plaintiff's medical records repeatedly refer to back strain and sprain, which are muscular conditions not spinal anomalies.  Warning her of the addictive potential of Norco, Dr. Lee recommended heat, exercise, and stretching.  Nothing in the record indicates that Plaintiff ever attempted to follow Lee's advice.  The record is replete with notes of Plaintiff requesting ever

///

18

1  stronger pain relievers, filling prescriptions early, running out of pain medication, and seeking

2  pain medication prescriptions from various physicians.

3      Plaintiff objects to the ALJ's considering her financial difficulties and divorce in his

4  assessment of her credibility.  The Court disagrees with her assertion that an apparent motivation

5  to gain disability benefits to alleviate other financial difficulties is not relevant to credibility,

6  especially in light of the many instances in the record in which Plaintiff raised the issue of her

7  financial difficulties.  Plaintiff's testimony that she would be able to resolve her dependence on

8  the husband whom she had sued for divorce when she received her disability insurance bespoke a

9  worrisome dependence on proving disability regardless of truth.  Similarly, Plaintiff testified that

10  she had stopped cooking elaborate dishes, not because her physical condition prevented her from

11  cooking, but because of too little money.

12      Finally, Plaintiff objects to the ALJ's subjective assessment of her testimony–that is, his

13  finding her testimony to be "well-rehearsed," and catching herself making statements beyond the

14  scope of the question.  This Court will not dispute the subjective credibility assessment of the

15  ALJ, who was present to watch and listen to the testimony first hand.

16      **D.    Did the ALJ Erroneously Reject the Opinions of Lee and Zamirpour?**

17      Plaintiff maintains that the ALJ erred in rejecting the opinions of her treating physicians,

18  Dr. Lee and Dr. Zamirpour.  The Commissioner responds that the ALJ properly rejected the

19  doctors' opinions, since they were not well-supported by objective medical evidence and were

20  inconsistent with other substantial evidence in the record.

21      Three types of physicians may offer opinions in social security cases: "(1) those who

22  treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the

23  claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

24  (nonexamining physicians)." *Lester*, 81 F.3d at 830.

25      A treating physician's opinion is generally entitled to more weight that the opinion of a

26  doctor who examined but did not treat the claimant, and an examining physician's opinion is

27  generally entitled to more weight than that of a non-examining physician. *Id.*  The Social Security

28  Administration favors the opinion of a treating physician over that of nontreating physicians.  20

19

1    C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a

2    greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th

3    Cir. 1987).

4         This Court's task is not to re-weigh the evidence but to determine whether the ALJ's

5    determination is supported by substantial evidence and free of legal error.  The Court must review

6    the ALJ's express reason(s) for declining to adopt a doctor's opinion and determine whether the

7    rejection was specific and legitimate.

8         Although an ALJ need not discuss every piece of evidence, he or she must consider the

9    combined effect of all of the claimant's impairments, including those that are not, by themselves,

10   of sufficient severity to establish a disability  *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir.

11   2003).  The ALJ may only consider limitations or restrictions attributable to medically

12   determinable impairments, not those attributable to other factors such as body build, age, or prior

13   experience.  S.S.R. 96-8p at *2 (June 2, 1996).

14        The ALJ discussed in detail the evidence tied to Lee and Zamirpour:

15   According to Dr. Lee, a treating physician at Kern Medical Center, the claimant
     has a long history of chronic lower back [*sic*] with associated radicular symptoms.
16   Her pain is exacerbated with any prolonged sitting or standing.  Because of her
     condition, it is difficult for her to do any kind of work.  The record contains a
17   preprinted form entitled Multiple Impairment Questionnaire signed by Dr.
     Zamirpour, a treating physician, who diagnosed the claimant with lumbar
18   radiculopathy and indicated that the claimant could not sustain any type of work
     for 8 hours a day.
19
20   Per Social Security Ruling 96-2P, controlling weight is generally given to the
     treating physician's opinion if that opinion is well-supported by medically
21   acceptable clinical and laboratory diagnostic techniques and is not inconsistent
     with other substantial evidence in the record.  Dr. Lee's opinion is not well
22   supported.  While his treating notes indicate the claimant should avoid prolonged
     standing, sitting, and heavy lifting, they do not support a disabling condition.  Dr.
23   Lee treated the claimant conservatively and gave her a steroid injection.  An x-ray
     of the lumbar spine showed mild levoscoliosis at L 3-4 and moderate degenerative
24   disc disease at L5-S1.  Both Drs. Lee and Zamirpour indicate that the claimant is
     disabled due to radiculopathy.  Complaints of radiculopathy, radiating pain, and
25   numbing and tingling are described in the record but are not well supported by the
     objective evidence.  A nerve conduction study dated September 15, 2008 showed
26   moderate to severe bilateral lower extremity neuropathy and L5 radiculopathy but
     an EMG on the same date of the bilateral lower extremities and lumbar paraspinals
27   was normal with no denervation or myopathy.  There have been no neurological
     defects.  She is noted either to have a normal gait or only a slight limp.  Straight leg
28   raising was either negative or only slightly positive.  The claimant went to the
     emergency room in March 2008 complaining of low back pain and leg and hand

tingling.  Both the neurological examination and the musculoskeletal examination
were marked normal.  She also went to the emergency room on July 11, 2008
complaining of severe low back pain at level 10; yet physical examination showed
no neurological defects, normal strength and tone, normal range of motion and
negative straight leg raising.  The emergency room doctor specifically noted the
inconsistency between the objective and subjective findings.  The claimant
requested Norco, a narcotic pain reliever, but it was declined and she was offered
alternative medication.  At the very recent orthopedic consultative examination of
January 2009, there was no evidence of radiculopathy.  The opinions of Drs. Lee
and Zamirpour are also inconsistent with other medical opinions; specifically, the
opinion of the orthopedic consultative examiner who concluded the claimant could
perform a range of medium work and the State Agency review physicians who
found the claimant capable of light work.  The treating physician's opinions are not
well-supported by medically acceptable clinical and laboratory diagnostic
techniques and are inconsistent with other substantial evidence in the record.
Therefore, neither Dr. Lee's nor Dr. Zamirpour's opinion is not worthy [*sic*] of
significant probative weight in this decision.

AR 29-30 (*citations to the record omitted*).

This Court agrees with the ALJ's determination to give little weight to Lee's and
Zamirpour's opinions.  The regulations provide that medical opinions be evaluated by considering
(1) the examining relationship; (2) the treatment relationship, including (a) the length of the
treatment relationship or frequency of examination, and the (b) nature and extent of the treatment
relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that
support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

**Dr. Lee.**  Although Dr. Lee treated Plaintiff for an extended period, the ALJ's assessment
of his opinion in light of objective medical evidence accurately revealed Lee's opinion to be
neither supportable nor consistent with other medical evidence.  Lee was a family practitioner
who repeatedly noted a need to refer Plaintiff to specialists in light of her continuing complaints
of back and leg pain.  Whether or not such referrals were ever actually made, Lee continued to
treat Plaintiff in a conservative manner, as the ALJ found.  The ALJ appropriately gave Lee's
opinion little weight.

**Dr. Zamirpour.**  This Court questions the ALJ's determination that Dr. Zamirpour was a
treating physician since it found no evidence in the record that Zamirpour was treating Plaintiff
other than Powell and Zamirpour's own representation on the multiple impairment questionnaire
provided by Plaintiff's attorney.  The questionnaire itself was apparently prepared by nurse
practitioner Powell, who treated Plaintiff as an adjunct to her treatment by Lee.  Powell signed the

21

1 questionnaire over a Zamirpour's stamped identification.  Because Powell could offer an opinion

2 as a treating nurse practitioner (20 C.F.R. § 404.1513(d)(1)), any error relating to the

3 determination of Zamirpour's relationship with Plaintiff is immaterial.

4        However Zamirpour's relationship to Plaintiff is characterized, the opinion is not

5 supportable since the representations in the questionnaire are not supported by evidence in

6 Plaintiff's medical records.  Neither is the opinion consistent with objective medical evidence.

7 Like Lee, Zamirpour was a family practitioner; Powell is a nurse practitioner functioning in a

8 family practice clinic.  The ALJ appropriately gave the opinion little weight.

9 **III.    Conclusion and Order**

10       Based on the foregoing, the Court finds that the ALJ applied appropriate legal standards

11 and that substantial credible evidence supported the ALJ's determination that Plaintiff was not

12 disabled.  Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative

13 decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter

14 judgment in favor of the Commissioner and against Plaintiff.

15

16 IT IS SO ORDERED.

17 **Dated:    March 7, 2011**                         _____/s/ Sandra M. Snyder_____
                                              UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28